# In the United States Court of Appeals for the Fourth Circuit

JUSTIN MICHAEL WOLFE,

*Appellant,*

v.

CHADWICK DOTSON, DIRECTOR,
VIRGINIA DEPARTMENT OF CORRECTIONS,

*Appellee.*

On Appeal from the United States District Court
for the Eastern District of Virginia
No. 1:22-cv-00700

**APPELLANT JUSTIN MICHAEL WOLFE'S OPENING BRIEF**

Scott M. Abeles
CARLTON FIELDS, P.A.
Suite 400 West
1025 Thomas Jefferson Street, NW
Washington, DC 20007
Telephone: (202) 965-8189

*Counsel for Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-6840__       Caption: __Wolfe v. Dotson_____

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Justin Michael Wolfe_____
(name of party/amicus)

_____

 who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO

2.      Does party/amicus have any parent corporations?                        ☐YES ☑NO
        If yes, identify all parent corporations, including all generations of parent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
        other publicly held entity?                                          ☐YES ☑NO
        If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☐NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Scott M. Abeles         Date: September 10, 2024

Counsel for: Justin Michael Wolfe

- 2 -

Print to PDF for Filing

**TABLE OF CONTENTS**

*Page*

TABLE OF AUTHORITIES ................................................................. iv

INTRODUCTION ............................................................................ 1

JURISDICTIONAL STATEMENT ...................................................... 9

STATEMENT OF ISSUES ............................................................... 10

STATEMENT OF CASE ................................................................. 11

    A.    Wolfe's Initial Trial ........................................................ 11

    B.    Original Federal Habeas Proceedings ................................ 11

    C.    The Commonwealth Retaliates ....................................... 13

    D.    Barber Caves to the Commonwealth's Threats ................... 15

    E.    This Court's 2013 Opinion in *Wolfe VI* ............................ 16

    F.    Retrial Proceedings ...................................................... 17

    G.    Wolfe Is Forced to Plead Guilty and Seek Relief via Appeal ....................................................................... 18

    H.    Barber's April 2023 Declaration ...................................... 19

    I.    Additional Evidence Of Wolfe's Actual Innocence .............. 22

    J.    The District Court's Opinions ......................................... 22

SUMMARY OF ARGUMENT .......................................................... 24

ARGUMENT ............................................................................... 29

# TABLE OF CONTENTS
## (continued)

I.  THE DISTRICT COURT APPLIED THE WRONG LEGAL
    STANDARD..................................................................29

    A.  "New" Evidence Is Defined Broadly and Doubts Are
        Resolved in the Petitioner's Favor........................31

    B.  The Government May Not Gain a Tactical Advantage in
        this Inquiry from Misconduct ...............................32

    C.  The District Court Defined "New" Evidence Narrowly,
        Resolved Doubts against Wolfe, and Allowed the
        Government to Gain from Misconduct ................34

II. WOLFE SATISFIES THE APPLICABLE TESTS FOR
    PRESENTING NEW, RELIABLE EVIDENCE ...........................39

    A.  Barber's New Exculpatory Testimony Was Not
        Reasonably Available at the Time of Wolfe's Plea ..............39

        1.  Barber's Voluntary Testimony Was Not
            Reasonably Available...................................40

        2.  Barber's Exculpatory Testimony Was Not
            Reasonably Available...................................41

        3.  Barber's Compelled Testimony Was Not
            Reasonably Available...................................43

    B.  Barber's 2023 Declaration Is "Newly Presented"................47

        1.  Barber's New Testimony Was Not Presented to the
            Trial Court...................................................48

2.   Testimony that Overlaps with Prior Testimony May Still Be Deemed "New" ........................................ 50

3.   Newly-Presented Evidence of Misconduct Supports a Finding of Actual Innocence...................... 53

C.   Barber's New Testimony Is Reliable .................................... 56

CONCLUSION ........................................................................................... 58

STATEMENT REGARDING ORAL ARGUMENT .................................. 58

CERTIFICATE OF COMPLIANCE......................................................... 59

# TABLE OF AUTHORITIES

*Page*

## Cases

*Atkins v. Chappius,*
    2020 WL 6264452 (W.D.N.Y. Oct. 23, 2020) .................................. 39

*Blackledge v. Perry,*
    417 U.S. 21 (1974) .......................................................................... 17

*Bousley v. United States,*
    523 U.S. 614 (1998) ........................................................................ 39

*Brewster v. Commissioner of Internal Revenue,*
    607 F.2d 1369 (D.C. Cir. 1979) ...................................................... 38

*Byrd v. Commonwealth,*
    2003 WL 23021981 (Va. Ct. App. Dec. 30, 2003) .......................... 44

*Cleveland v. Bradshaw,*
    693 F.3d 626 (6th Cir. 2012) .................................. 30, 32, 50, 51, 52

*Dick v. Muse,*
    2014 WL 4854689 (E.D. Va. Sept. 29, 2014) ..................... 30, 48, 57

*Finch v. McKoy,*
    914 F.3d 292 (4th Cir. 2019) ................................................. 6, 7, 23

*Floyd v. Vannoy,*
    894 F.3d 143 (5th Cir. 2018) .......................................................... 54

*Gladney v. Pollard,*
    799 F.3d 889 (7th Cir. 2015) .......................................................... 49

*Gomez v. Jaimet,*
    350 F.3d 673 (7th Cir. 2003) ............................................. 33, 48, 50

*Gosling v. Commonwealth*,
  14 Va. App. 158 (1992) ........................................................ 8, 43, 44

*Griffin v. Johnson*,
  350 F.3d 956 (9th Cir. 2003) ........................................................ 48

*Hash v. Johnson*,
  845 F. Supp. 2d 711 (W.D. Va. 2012) ............................................. 54

*House v. Bell*,
  547 U.S. 518 (2006) ............................................................ *passim*

*Jimerson v. Payne*,
  957 F.3d 916 (8th Cir. 2020) ........................................................ 33

*Lampkins v. Commonwealth*,
  44 Va. App. 709 (2005) ................................................................ 46

*Lisker v. Knowles*,
  463 F. Supp. 2d 1008 (C.D. Cal. 2006)*, abrogated on other grounds*, *Lee v. Lampert*, 610 F.3d 1125 (9th Cir. 2010) ........................................................................................ 54

*Lopez v. Miller*,
  915 F. Supp. 2d 373 (E.D.N.Y. 2013) .............................................. 39

*McQuiggin v. Perkins*,
  569 U.S. 383 (2013) ................................................................ 6, 23

*Mubang v. United States*,
  2011 WL 3511078 (D. Md. Aug. 9, 2011) ....................................... 48

## TABLE OF AUTHORITIES
(continued)

*Reeves v. Fayette SCI*,
    897 F.3d 154 (3d Cir. 2018), *as amended* (July 25,
    2018) ........................................................................ 8, 30

*Reyes v. Virginia*,
    2022 WL 2161031 (E.D. Va. June 14, 2022) ........................... 48, 49

*Royal v. Taylor*,
    188 F.3d 239 (4th Cir.1999) ................................................. 8, 30, 31

*Schlup v. Delo*,
    513 U.S. 298 (1995) ............................................................ *passim*

*Smith v. Baldwin*,
    466 F.3d 805 (9th Cir. 2006), *rev'd on other grounds*,
    510 F.3d 1127 (9th Cir 2007) .................................................... 33, 53

*Teleguz v. Zook*,
    806 F.3d 803 (4th Cir. 2015) .................................................... 17, 53

*Temple v. Commonwealth*,
    75 Va. 892 (1881) ............................................................. 44

*United States v. Ball*,
    18 F.4th 445 (4th Cir. 2021) .......................................... 17

*United States v. MacDonald*,
    641 F.3d 596 (4th Cir. 2011) .......................................... 30

*United States v. Williams*,
    790 F.3d 1059 (10th Cir. 2015) ................................. 54

*Williams v. Muse*,
    2014 WL 2921932 (E.D. Va. June 27, 2014) .............. 48

*Wolfe v. Clarke*,
  2012 WL 13103658 (E.D. Va. Dec. 26, 2012) ........................ *passim*

*Wolfe v. Clarke*,
  691 F.3d 410 (4th Cir. 2012) ........................................ 1, 11, 12, 45

*Wolfe v. Clarke*,
  718 F.3d 277 (4th Cir. 2013) ................................................. *passim*

*Wolfe v. Clarke*,
  819 F. Supp. 2d 538 (E.D. Va. 2011) ................................................. 1

*Wolfe v. Johnson*,
  565 F.3d 140 (4th Cir. 2009) ................................................. *passim*

*Wolfe v. Johnson*,
  940 F. Supp. 2d 280 (E.D. Va. 2010) ................................................. 2

**Statutes**

28 U.S.C. § 2253 ................................................................. 10

U.S. Code § 1291 ................................................................. 9

Va. Code Ann. § 19.2–270 ............................................... 44, 46

**Rules**

Federal Rule of Civil Procedure 12 ................................................. 30, 36

Federal Rule of Civil Procedure 59 ................................................. 9

# INTRODUCTION

The last time the parties were before the Court, in 2013, this Court reviewed a district court decision (i) ordering Appellant Justin Michael Wolfe released from prison; and (ii) barring the Commonwealth of Virginia from further prosecution of him. *See Wolfe v. Clarke*, 2012 WL 13103658, *13 (E.D. Va. Dec. 26, 2012) (*Wolfe V*). Just a year before, Judge Raymond Jackson found a dizzying array of constitutional violations and vacated Wolfe's convictions, but did not, at that time, bar retrial. *See Wolfe v. Clarke*, 819 F. Supp. 2d 538 (E.D. Va. 2011) (*Wolfe III*). This Court affirmed that order of habeas relief, lambasting the Commonwealth's startling misconduct as "abhorrent to the judicial process." *Wolfe v. Clarke,* 691 F.3d 410, 424 (4th Cir. 2012) *(Wolfe IV)*.[1]

Before the ink was dry on this Court's mandate, the Commonwealth of Virginia retaliated.

As this Court observed previously, "Wolfe's conviction was primarily secured on the basis of evidence from the triggerman himself,

---

[1] Citations to the Joint Appendix are denoted by "JA" and to the first page of a given document in the Appendix unless otherwise noted. In this brief, unless otherwise noted, all emphasis is added and internal citations and quotations are omitted.

another drug dealer named Owen Barber IV." *Wolfe v. Johnson*, 565 F.3d 140, 144 (4th Cir. 2009) (*Wolfe I*). Barber was the prosecution's star witness at Wolfe's original trial, "and the only witness to provide any direct evidence regarding the 'for hire' element of the murder offense and the involvement of Wolfe therein." *Id.*

But during Wolfe's original habeas proceedings, Barber came forward and recanted his damning trial testimony, declaring that Wolfe had nothing to do with Petrole's murder. The district court credited Barber's testimony in finding Wolfe satisfied the standards for "actual innocence," allowing Wolfe's defaulted habeas claims to be heard on the merits, and ultimately be vindicated. *Wolfe v. Johnson*, 940 F. Supp. 2d 280, 287 (E.D. Va. 2010) ("actual innocence" gateway satisfied) (*Wolfe II*).

The prosecution did not take that lying down. ***One day*** after this Court's mandate affirming the habeas award came down, the Commonwealth's prosecution team paid an unannounced visit to Owen Barber in prison and proceeded to browbeat him, without a lawyer present, for over an hour. Throughout the course of the secretly-recorded interview, the prosecutors made clear that they thought Barber lied when giving the testimony the district court deemed "credible" and

"persuasive" in awarding Wolfe the relief this Court had affirmed, and that doing so exposed him to a claim he breached his cooperation agreement. They told him he could be retried for capital murder and sentenced to death. Though they would later claim they visited Barber to learn how he would testify so they could prepare for retrial, they received their answer within five minutes – Barber would again testify favorably to Wolfe – so they devoted the rest of their efforts to changing his mind.

The next day – cutting short their "trial prep" – the prosecutors withdrew. With Barber either back in line with the tainted testimony from Wolfe's first trial or scared out of the case, the path to a new indictment was paved. A new prosecutor obtained six new charges, plus the original three, dramatically increasing the penalty range Wolfe faced, all after Wolfe successfully exercised his constitutional right to appeal.

Wolfe brought the Barber "interview" to the district court's attention. By that time, because of the government's threats, Barber had invoked his right against self-incrimination during retrial proceedings in state court. Before the district court, Barber's lawyer testified that Barber would continue to do so, including if called as a witness during trial. The district court held that "the Original Prosecuting Team has

scared Barber into invoking his Fifth Amendment right to avoid self-incrimination," and thereby "denied Petitioner a credible direct and rebuttal witness to defend himself from the charges he faces." *Wolfe V*, 2012 WL 13103658, at *13. The interview "incurably frustrated the entire purpose" of the habeas proceedings, and "permanently crystalized" the constitutional violations infecting Wolfe's trial, warranting Wolfe's release and a bar on a new trial. *Id.*

This Court reversed the district court's **remedy**, asserting that a retrial bar was too severe, and that on the record at the time the "district court's conclusion concerning the availability of Barber's testimony at a retrial" was "speculative." *Wolfe v. Clarke*, 718 F.3d 277, 289-90 (4th Cir. 2013) (*Wolfe VI*). According to the Court, notwithstanding the Commonwealth's threats, it was conceivable Barber could be compelled to testify, or otherwise agree to be called. *Id.*

This Court did not, however, exonerate the Commonwealth, and acknowledged the misconduct "could, ***at the proper time***, constitute a separate ground for federal habeas corpus relief." *Id.* at 290. In a separate opinion concurring in part and dissenting in part, Justice Thacker

described the Commonwealth's chasing of Barber off the stand as the "pinnacle" of the Commonwealth's misconduct. *Id.* at 295.

Facing the death penalty, and a new swath of charges that virtually guaranteed he would spend decades (or life) in prison even if he beat the murder charges, ***all without his best witness***, Wolfe pled guilty. He was sentenced to 83 years in prison (42 suspended) and ordered to pay around $871,000.00. Following appeals, Wolfe sought habeas relief in the Eastern District of Virginia. JA007.

After filing his original petition, Wolfe learned that Barber was willing to come forward with the testimony the Commonwealth had suppressed. In a sworn declaration witnessed by his attorney, Barber stated that Wolfe "had nothing to do with the killing of Daniel ("Danny") Petrole," that "[t]here was no agreement between Justin and me to kill Danny Petrole;" that he "did not have any discussion, at any time, with Justin about killing Danny Petrole;" and that "Justin did not know [Barber] was going to kill Danny." JA570. He also provided critical testimony on the materiality of the Commonwealth's misconduct, tying the government's intimidation of him to the exercise of his Fifth Amendment rights, while admitting that if he had been forced to testify

he would have done so falsely, to avoid the Commonwealth's wrath. JA570. In short, Barber removed all speculation as to whether and how he would have testified if called at retrial and confirmed that his exculpatory testimony was not available when Wolfe pled.

Wolfe filed an Amended Petition and attached Barber's new Declaration, asserting that it supported additional habeas claims for witness intimidation and the suppression of exculpatory evidence. JA047. And because the evidence was not available to Wolfe when he pled guilty, it constituted "new, reliable evidence" under *Schlup v. Delo*, 513 U.S. 298, 324-25 (1995), a threshold requirement for Wolfe's "actual innocence" showing.

In federal habeas law, the actual innocence exception is one application of the broader "fundamental miscarriage of justice" exception to procedural default intended to ensure that "federal constitutional errors do not result in the incarceration of innocent persons." *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013). This exception covers the full range of procedural defaults, including the statute of limitations. *See Finch v. McKoy*, 914 F.3d 292, 294 (4th Cir. 2019). An actual innocence showing requires that part of the petitioner's showing be "new, reliable evidence,"

that was not available at the time of his conviction or plea, or previously presented to the trial court. *See Schlup,* 513 U.S. at 324.

An actual innocence showing is important to Wolfe because the Virginia Court of Appeals held that Wolfe forfeited his primary, vindictive prosecution claim, and a finding of actual innocence would cure such a default. Wolfe also did not exhaust his claims via a habeas petition in the Virginia state court system, which an actual innocence finding would also cure. And Wolfe's counsel miscalculated the due date for the original habeas petition by one day, but a showing of actual innocence would cure that default too. *See Finch*, 914 F.3d at 294.

Though Barber's exculpatory testimony was suppressed for a nearly a dozen years, the district court held that when finally disclosed it was not "new" evidence. JA2161. Invoking this Court's 2013 opinion that it was "speculative" as to how Barber might testify at Wolfe's then-pending retrial, the court thought Wolfe did not "foreclose" all doubt as to whether Barber's exculpatory testimony would have become available. JA2162.

The district court erred. *Wolfe VI* considered the *conceivability* of Barber testifying at Wolfe's retrial while applying the highest legal

standard in federal habeas law. *Wolfe VI,* 718 F.3d at 290-91. Under it, all doubts were resolved in the Commonwealth's favor. *Id.* at 291.

That standard bears no relation to the test for new evidence under *Schlup*. Evidence is "new" in this context if was not reasonably available to the petitioner at the time of the trial or guilty plea or, alternatively, was not previously presented to the trial court. *See, e.g., Royal v. Taylor*, 188 F.3d 239, 244 (4th Cir.1999) (under *Schlup*, a gateway innocence claim should be evaluated "in light of all available evidence, including that considered unavailable or excluded at trial and any evidence that became available only after trial"); *Reeves v. Fayette SCI*, 897 F.3d 154, 161 (3d Cir. 2018), *as amended* (July 25, 2018) (noting that the courts of appeal are split as to which standard to apply).

There was no need for the court below to consider what *would* have happened if Wolfe proceeded to trial. The *Schlup* inquiry compares the evidence reasonably available to Wolfe when he pled guilty to the evidence available when he submitted his habeas petition – two fixed points in time. By the time Wolfe pled Barber had twice refused to testify in the face of the Commonwealth's threats, and his lawyer testified that his invocation of Fifth Amendment rights would continue. Virginia law

does *not* allow courts to compel witnesses who plead the Fifth to testify, even if offered immunity. *See Gosling v. Commonwealth,* 14 Va. App. 158, 165 (1992). In short, Barber's April, 2023 exculpatory testimony was not reasonably available to Wolfe in 2015, when he pled guilty.

The district court's error is glaring and material. Had it conducted a proper *Schlup* inquiry, there is no doubt it would find Wolfe satisfies the actual innocence standard. Wolfe has satisfied that standard before, and Wolfe's showing is stronger today than it was when he satisfied it the first time. And, if and when the merits of his Amended Petition are considered, Wolfe is again well-positioned to obtain relief, as he presents textbook claims for vindicative prosecution based on the *tripling* of charges against him after his initial successful habeas efforts, and for the suppression of an exculpatory witness. This Court should reverse.

## JURISDICTIONAL STATEMENT

Pursuant to 28 U.S. Code § 1291, this Court has appellate jurisdiction over the district court's final order granting in part, and denying in part, Wolfe's motion to alter or amend the judgment under Fed. R. Civ. P. 59 (JA2165-2170) ("Rule 59 Order"), and all orders

incorporated in that order, including the district court's order dismissing Wolfe's Amended Petition (JA2149-2164) ("Dismissal Order").

In addition, the district court issued a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2), finding Wolfe "made a substantial showing of the denial of a constitutional right." JA2162. As the district court noted, were the court to reach the merits, they would "present substantial issues upon which reasonable jurists may disagree," especially in light of the "troubling history of Wolfe's criminal proceedings and substantial nature of his constitutional claims." JA2163.

## STATEMENT OF ISSUES

The district court held that Barber's 2023 Declaration, exculpating Wolfe for murder and containing evidence of prosecutorial misconduct, was not "new" for purposes of establishing actual innocence under *Schlup*. It reasoned that Barber's latest testimony did not "foreclose" all speculation as to whether and how he would have testified at Wolfe's retrial, and did not contain new content. The issues presented are:

1.     The standard for establishing whether evidence is "new" for purposes of satisfying the actual innocence gateway under *Schlup v. Delo*, 513 U.S. 298 (1995).

2.    Whether Petitioner's evidentiary showing satisfies the "new, reliable" evidence standard under *Schlup*.

## STATEMENT OF CASE

### A.    Wolfe's Initial Trial

In 2001, a grand jury indicted nineteen-year-old Justin Wolfe on three charges – (1) conspiracy to distribute marijuana, (2) use or display of a firearm in the commission of a felony, and (3) capital murder for hire – on the Commonwealth's theory that Wolfe hired his friend and fellow marijuana-dealer, Owen Barber, to kill a supplier named Daniel Petrole. At trial, the only direct evidence against Wolfe was Barber's testimony that Wolfe hired him to kill Petrole. Wolfe was convicted of murder and other charges and sentenced to death. *Wolfe IV*, 691 F.3d at 412-13.

### B.    Original Federal Habeas Proceedings

During Wolfe's original federal habeas proceedings, evidence of extraordinary prosecutorial misconduct came to light. The prosecutors did not conduct a proper investigation, quickly concluded Wolfe was guilty, and ignored evidence that contradicted their case theory. *See id.* at 417, 426 n.9. They suppressed a mountain of exculpatory evidence, *see id.* at 418 n.7, which was "entirely intentional." *Id.* at 423. They admitted

they made it a practice to withhold exculpatory evidence to ensure defendants cannot "fabricate" a defense. *Id.* at 423-24. Barber recanted his 2002 trial testimony and swore Wolfe was not involved in the murder. The district court found his testimony "persuasive." *Id.* at 418. Barber's testimony confirmed the district court's earlier conclusion that Wolfe satisfied the actual innocence standard, as "it was 'more likely than not that no reasonable juror would have found Wolfe guilty.'" *Id.* at 414-15.

This Court affirmed, reiterating that the Commonwealth's conduct had been "not only unconstitutional in regards to due process, but abhorrent to the judicial process." *Id.* at 424. It reprimanded the Commonwealth for "tenaciously conceal[ing]" exculpatory evidence. *Id* at 422. It felt "compelled to acknowledge that the Commonwealth's" violations were "entirely intentional." *Id.* at 423. Describing the prosecutor's rationale for suppressing evidence – so it could not be used "to fabricate a defense" – as "flabbergasting," it found this Court had "rightly lambasted" the Commonwealth. *Id.* "We sincerely hope," the Court concluded, "that the Commonwealth's Attorney and his assistants have finally taken heed of those rebukes." *Id.* at 424.

## C. The Commonwealth Retaliates

The Commonwealth did not take heed. The Fourth Circuit's mandate in *Wolfe IV* issued on September 10, 2012. The next day the Commonwealth's Attorney, his assistant, and the lead investigator "interviewed" Barber at the Augusta Correctional Center. The officials "attempted to coerce Barber to repeat his 2002 trial testimony upon retrial – the same testimony that the district court found 'contained falsities.'" *Wolfe VI,* 718 F.3d at 281-82, 285. They suggested that Barber's testimony at habeas "was inconsistent with his trial testimony," so "he had breached his plea agreement." *Id.* at 282. They told him the supposed breach could subject him to "the death penalty." *Id.*

They also complained that the reversal of Wolfe's case "soiled" their "reputations." JA488. They invoked scripture and Barber's recently deceased mother and ill father to coerce Barber into abandoning the testimony this Court credited on habeas in favor of the judicially condemned testimony from the original trial. *Wolfe VI*, 718 F.3d at 297-98. Doing so was the "pinnacle" of the Commonwealth's misconduct. *Id.* at 295 (Thacker, J. concurring in part).

Two days after the Barber interview, the prosecutors recused themselves. *Wolfe V*, 2012 WL 13103658, at *8. One day later, the new prosecutor told the circuit court that he had already concluded that Wolfe "was absolutely involved in this murder and planned it and caused it to occur and he did it out of greed . . . . Justin Wolfe is many things but innocent is not one of them." JA536. He admitted he had only reviewed files from the tainted first trial. JA536.

On October 1, 2012, without new investigation, the prosecutor presented new charges to a grand jury, which returned six more indictments in addition to the original three, consisting of:

- Two new and additional drug charges;

- One new and additional capital murder charge;

- One new and additional felony murder charge;

- One new and additional charge for use of a firearm during a robbery; and

- One new and additional charge for use of a firearm in the commission of a murder.

*Wolfe VI*, 718 F.3d at 282. In sum, following habeas relief, Wolfe faced three counts of murder, three firearms charges, and three drug charges. He had faced just one of each at the original trial.

## D.     Barber Caves to the Commonwealth's Threats

Wolfe called Barber to testify at a hearing held on October 31, 2012 in the Prince William County circuit court relating to Wolfe's motion to disqualify the new prosecutor. JA876. By that time, an attorney, Christopher Leibig, had been appointed for him. Mr. Leibig informed the Court that Barber intended to exercise his Fifth Amendment rights, which Barber confirmed on the stand before being excused. JA869, JA874, JA876-879; JA575.

In the meantime, Wolfe brought the Barber interview to the district court's attention, as it maintained jurisdiction to enforce its habeas orders. The district court ordered the Commonwealth to show cause why that meeting "does not constitute extraordinary circumstances warranting the Court to order [Wolfe's] immediate release and bar current and future prosecutions of Wolfe." *Wolfe VI*, 718 F.3d at 283. At a hearing December 13, 2012, Mr. Leibig testified that Barber intended to exercise his Fifth Amendment rights at the hearing and for the remainder of Wolfe's proceedings. JA1091-1093; *Wolfe VI,* 718 F.3d at 283-84. The court also called Barber and questioned him to establish he

was unaware the interview had been tape recorded. JA1102; JA576 (discussing why he took the Fifth).

### E.    This Court's 2013 Opinion in *Wolfe VI*

In the district court's ruling on the issue, it found that "the Original Prosecuting Team has scared Barber into invoking his Fifth Amendment right to avoid self-incrimination," and thereby "denied Petitioner a credible direct and rebuttal witness to defend himself from the charges he faces." *Wolfe V,* 2012 WL 13103658, at *13. The interview "incurably frustrated the entire purpose" of the federal habeas proceedings, and "permanently crystalized" the constitutional violations infecting Wolfe's trial, warranting Wolfe's release and a bar on a new trial. *Id.*

On appeal, this Court found that a retrial bar was too severe a sanction, and that on the record at the time, the "district court's conclusion concerning the availability of Barber's testimony at a retrial" was "speculative". *Wolfe VI*, 718 F.3d at 289-90. This Court did not, however, exonerate the Commonwealth, and acknowledged the misconduct "could, ***at the proper time***, constitute a separate ground for federal habeas corpus relief." *Id.* at 290. In a later decision, this Court described the facts relating to the Barber "interview" as follows: "In *Wolfe*

*[VI]*, the prosecution illicitly threatened a recanting witness whose recantation had already been deemed candid and persuasive at an evidentiary hearing to impact how he would testify at Wolfe's retrial." *See Teleguz v. Zook*, 806 F.3d 803, 812 (4th Cir. 2015).

## F.    Retrial Proceedings

Wolfe moved the Prince William County circuit court to dismiss, arguing the new indictments were unconstitutionally vindictive. JA090-106. The law is well settled that when "a prosecutor seeks more severe penalties *on retrials obtained by a defendant*, the prosecutor's decision is *presumed* to be vindictive, on the theory that it is more likely to be an impermissible response to the defendant's obtaining a new trial — as is his legal right — as distinct from a legitimate response to criminal conduct." *See United States v. Ball*, 18 F.4th 445, 455 (4th Cir. 2021) (original emphasis) (citing *Blackledge v. Perry*, 417 U.S. 21, 28–29 (1974)). The Commonwealth argued its conduct could not be presumed vindictive because "a convicted capital murder defendant **cannot** be chilled from appealing" because no penalty is more severe than death. *See* JA108-119. This implicit "death-penalty exception" to vindictive prosecution claims was not just dystopian, but irreconcilable with

binding authority, which established that an increased penalty range was all that was required. JA055. The trial court nonetheless credited the latter argument, finding a presumption unwarranted because Wolfe did not face a more severe penalty than death under the new charges. JA314-315.

Wolfe also moved to dismiss on prosecutorial misconduct grounds in light of the Barber interview. JA329-344. The circuit court deemed that concern premature and denied the motion. *See* JA421-422.

### G. Wolfe Is Forced to Plead Guilty and Seek Relief via Appeal

Concluding he had no hope of a fair trial, and without his star witness, Wolfe pled guilty to the use of a firearm in the commission of a felony, conspiracy to distribute marijuana, and murder. *See* JA381-382. He then appealed, asserting the trial court erred in accepting his guilty plea because (i) he was the target of vindictive prosecution; and (ii) the Barber interview resulted in the elimination of exculpatory evidence and rendered Wolfe's plea involuntary. JA394-398. JA398-402.

His appeal traveled twice through Virginia's appellate courts, including a successful petition to the U.S. Supreme Court. The bottom line, however, is that the trial court's decision was left intact on

procedural grounds. JA015-017 (describing path of appeals). In particular, the Virginia Court of Appeals claimed Wolfe forfeited a dispositive argument, and with it his constitutional rights. JA418-419. The Commonwealth's courts, consequently, left the Commonwealth's clearly unconstitutional payback unremedied.

Wolfe filed his original Petition for Habeas Relief on June 22, 2022. JA007-046. The filing appears to have been made one day after the statute of limitations expired.

## H.    Barber's April 2023 Declaration

On April 12, 2023, Owen Barber signed a new Declaration before his counsel, Mr. Leibig, and counsel for Wolfe received it the following day, April 13. JA570-577.[2]

Barber states that "Justin had nothing to do with the killing of Daniel ("Danny") Petrole," that "[t]here was no agreement between Justin and me to kill Danny Petrole," that he "did not have any

_____

[2] Mr. Leibig has also submitted an Affidavit attesting to the voluntary nature of Barber's new Declaration, that he provided legal counsel to Barber in conjunction with his signing, that Barber was not offered anything in return for his Declaration, and that Barber understands his Declaration are being used in these proceedings, waiving his Fifth Amendment rights. *See* JA774.

discussion, at any time, with Justin about killing Danny Petrole," and "Justin did not know [he] was going to kill Danny." JA570. He explains that, following Wolfe's successful habeas proceedings, "if asked to testify at his retrial, [he] intended to testify consistent with [his] testimony in federal court," which had exonerated Wolfe. JA572.

That changed following the Commonwealth's interview. JA572. Barber explains that the officials devoted themselves to talking him out of testifying as he had during the federal habeas proceedings. JA572, JA573-574. And he confirms that their invocation of his cooperation agreement, threat of a retrial for capital murder, insinuations about death and his prison privileges, and other statements were intended to cause him to repudiate the favorable testimony provided during habeas proceedings, and implicate Wolfe, resulting in his silence ever since:

> As a result of the September 11, 2012 discussion with Conway, Ebert, and Newsome, I decided I was too afraid to testify any further in Justin's case. I did not want to be retried for capital murder and, given my confessions, likely sentenced to death after trial. I took the threats Conway, Ebert, and Newsome 100% seriously. I believe that if I had testified in Justin's favor at a retrial, there is a good chance I would not be alive today. At a minimum I'm sure my quality of life in prison would have been made worse.

JA575. Consistent with the exercise of his Fifth Amendment rights in both state and federal proceedings following the September 11 interview, consequently, Barber confirms that this evidence was not available to Wolfe at the time of his plea bargain.

Barber's testimony was confirmed by especially credible witnesses with personal knowledge of the circumstances surrounding Barber's suppressed testimony and whether such testimony was available to Wolfe when he pled guilty.

Bernadette Donovan, Esq., was one of Wolfe's attorneys at the time of his plea, and expressly addressed, in great detail, *inter alia,* why Barber's exculpatory testimony "was not reasonably available to Mr. Wolfe at the time of Mr. Wolfe's plea." *See* JA2143-2145 (spelling out Commonwealth's obsessive focus on prosecuting Barber for perjury, not securing his cooperation, and noting: "there was no fathomable possibility that Morrogh would immunize Mr. Barber to again give that same exonerating testimony in state court"). Christopher Leibig, Barber's lawyer, explains that Barber would never have voluntarily testified at Wolfe's retrial, the Commonwealth never approached him about an

immunity agreement for Barber, and there is no chance one would have been reached. *See* JA2146-2148

## I.     Additional Evidence Of Wolfe's Actual Innocence

As the district court found when finding Wolfe actually innocent in 2010, there is "considerable corroboration" of Barber's statement taking sole responsibility for the murder. *Wolfe II,* 940 F. Supp. 2d at 286–87. That evidence included affidavits from Barber's former cell mate, former roommate, and a private investigator working on behalf of Wolfe's counsel all providing statements corroborating Barber's confession that he had acted alone, and Wolfe was innocent. *Id.* at 283, 286. Wolfe included the new Barber Declaration, and the corroborating evidence in an Amended Petition filed May 31, 2023. JA047-088.

## J.     The District Court's Opinions

In its Dismissal Order, the court below invoked two grounds in support. It first observed that Wolfe's original petition was filed one day late and held that a showing of actual innocence does not provide an exception to the AEDPA's one-year statute of limitations. JA2158-2160. Second, it held that even if actual innocence could provide a gateway around the statute of limitations, Wolfe failed to bring forward "new,

reliable evidence," the threshold requirement under *Schlup*. JA2161-2162. It reasoned that this Court in *Wolfe VI* had held that it was "speculative" whether Barber would voluntarily, or be compelled to, testify at a retrial of Wolfe. JA2162. In the Court's view, Barber's 2023 Declaration did not "foreclose" that "speculation." JA2162

In a timely-filed Rule 59 motion (ECF 36), Wolfe reminded the district court of binding authority holding that "[a]ctual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar ... or expiration of the statute of limitations." *McQuiggin*, 569 U.S. at 383-84; *Finch*, 914 F.3d at 294 (same, citing *McQuiggin*). Thus, the court's assertion that actual innocence did not cure a limitations violation was clearly erroneous.

Wolfe further explained that the district court clearly erred by finding Barber's new exculpatory statement was not "new" for purposes of *Schlup*. Barber's statement satisfied the relevant tests for new evidence and made the evidence pointing to Wolfe's innocence materially stronger than the evidence available at the time of Wolfe's plea.

In its Rule 59 Order, the district court agreed that its first holding was clearly erroneous. Order, JA2165-2170. And "[b]ecause this Court's

opinion conflicted with the binding authority in *McQuiggin*, it was 'a clear error of law,' and it is appropriate to amend the order previously entered pursuant to Rule 59(e)." JA2167.[3]

But the district court declined to reconsider its alternative finding that the 2023 Barber Declaration was not "new." JA2165-2170. It asserted that Barber's latest declaration "does not contain new information concerning Petrole's murder." JA2168. It added that "Barber's most recent declaration had in fact already been presented and considered by this Court and the Fourth Circuit in previous habeas proceedings." JA2169. And it stated that Wolfe's position "takes issue with the Fourth Circuit's previous holding [in *Wolfe VI*], which this Court must faithfully apply." JA2169

Wolfe's timely-filed notice of appeal followed. JA2171.

## SUMMARY OF ARGUMENT

In finding the 2023 Barber Declaration did not qualify as "new" evidence, the district court applied the wrong legal standard. *See*

---

[3] The district court blamed Wolfe for not invoking the relevant authority until bringing his Rule 59 motion. JA2167. The district court was mistaken, as Wolfe timely identified the governing authority in his Amended Petition. *See* JA073.

Section I, *infra*. Under *Schlup,* "new" evidence is defined broadly. *Id.* at §I(A). Doubts are resolved in the petitioner's favor. *Id.* If the government's conduct contributes to ambiguity regarding whether evidence is new, courts take care to prevent the government from obtaining a litigation advantage from its misconduct. *Id.* at §I(B).

Here the district court lost sight of the fact that the testimony contained in Barber's 2023 Declaration was unlawfully suppressed, so was not *reasonably* available at the time of Wolfe's plea. This Court's 2013 opinion did not address that suppression; instead, it expressly reserved that question for future habeas proceedings.

The district court exacerbated its error by applying an overly-strict definition of "new" evidence. *Id.* at §I(C). It believed that Wolfe had to "foreclose" all speculation as to whether and how Barber may have testified at a hypothetical retrial of Wolfe, in light of *Wolfe VI*. JA2162. *Wolfe VI* considered whether the Commonwealth should be barred from further prosecution of Wolfe, applying an extraordinarily high and entirely different standard of review. *Wolfe VI*, 718 F.3d at 290-91. Under it, Wolfe had to demonstrate that it was impossible for him to receive a fair trial in the Commonwealth of Virginia.

The standard for establishing whether evidence is "new" under *Schlup*, in contrast, is entirely distinct and far lower. Wolfe needed only to establish that the new evidence was not reasonably available to him at the time of the plea, or was not previously presented to the trial court, with doubts resolved in Wolfe's favor, not the government's.

The showing Wolfe made easily satisfies the correct standards for establishing evidence is "new" under *Schlup*. *See* Section II, *infra*. Barber's *voluntary* testimony was not reasonably available when Wolfe pled – Barber and his attorney, by that time, had made abundantly clear under oath that Barber would not testify voluntarily, given the Commonwealth's threats. *Id.* at §II(A)(i). Nor could Barber have reasonably been *compelled* to testify, as Virginia law does not authorize courts to override invocations of the Fifth Amendment merely because the prosecutor tenders an immunity offer. *Id.* at §II(A)(iii). Barber's attorney has provided unrebutted evidence that there was no possibility Barber could have reached a private immunity agreement with the State that would have protected him from all criminal exposure and allowed Barber to testify truthfully. *Id.*

Nor was Barber's *exculpatory* testimony – voluntary or compelled – reasonably available when Wolfe pled. *Id.* at §II(A)(ii). That is because the Commonwealth's officials had threatened to retry Barber for capital murder if he testified consistently with the way he had during habeas proceedings, and Barber has conceded that if forced to testify at Wolfe's retrial he would have had to lie and inculpate Wolfe anew, given the State's threats. *Id.* In sum, the testimony contained in Barber's 2023 Declaration was not reasonably available at the time of Wolfe's plea.

Barber's exculpatory testimony is also new because it was not presented during retrial proceedings. *Id.* at §II(B). When called, Barber refused to testify. *Id.* at §II(B)(i). At Wolfe's original trial proceedings, Barber testified *against* Wolfe. While Barber has testified in federal habeas proceedings before, his testimony is nonetheless new despite any overlap. *Id.* at §II(B)(ii).

Barber's exculpatory testimony provides new context for his shifting positions over time. The context now is starkly different because the Commonwealth's prosecutors never withdrew their threats against him, making this testimony the most credible to date. *See id.* It also provides new insight into the impact of the Commonwealth's misconduct

on his decision not to testify. *Id.* at §II(B)(iii). Courts have credited evidence of misconduct as evidence pointing to actual innocence on the logic that the government should not have to cheat to convict someone it can otherwise prove is guilty beyond reasonable doubt. *Id.*

Ultimately, the district court's task is to "assess the probative force" of the newly available or presented evidence "in connection with the evidence" in hand when Wolfe pled. *Schlup,* 513 U.S. at 331–32. There can be no reasoned argument that Wolfe's actual innocence evidentiary package is not stronger today than when he pled, because Barber came forward with the suppressed testimony during these habeas proceedings. That should end the debate over whether his testimony is "new."

Finally, the district court, seemingly in *dicta*, suggested that Barber's new testimony may not be reliable. But in Wolfe's prior habeas proceedings, the district court found Barber's exculpatory testimony credible and persuasive when finding Wolfe met the actual innocence test the first time, and when fashioning the initial award of habeas relief. The district court did so, at that time, after watching Barber on direct and cross-examination, and questioning Barber directly. This time the court did not afford Wolfe an evidentiary hearing and did not take testimony,

which this Court has held is necessary when the petitioner makes a colorable claim of innocence. *See* Section II(C).

## ARGUMENT

## I. THE DISTRICT COURT APPLIED THE WRONG LEGAL STANDARD

When a petitioner raises a *Schlup* gateway actual innocence claim, it must be supported by "new reliable evidence" pointing to innocence. *Schlup*, 513 U.S. at 324. Once that threshold is met, the district court "must consider 'all the evidence' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial.'" *House v. Bell*, 547 U.S. 518, 538 (2006).

In light of this evidence, the district court must determine whether "it is more likely than not that no reasonable juror would have found [the] petitioner guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 327. If so, the petitioner has satisfied *Schlup* and the district court must review any defaulted claims. *House*, 547 U.S. at 538.

"The Supreme Court opinions addressing the actual innocence gateway do not explicitly define 'new evidence,'" and the "circuits are split on whether the evidence must be newly discovered or whether it is

sufficient that the evidence was not presented to the fact-finder at trial." *Reeves*, 897 F.3d at 161; *see also Cleveland v. Bradshaw*, 693 F.3d 626, 633 (6th Cir. 2012) (noting circuit split).

This Court has alluded to both standards without ruling one or the other out. *See, e.g., United States v. MacDonald*, 641 F.3d 596, 611 (4th Cir. 2011) (in this inquiry, courts should consider "evidence that was either *excluded or unavailable* at trial"); *Taylor*, 188 F.3d at 244 (claim should be evaluated "in light of all available evidence, including that considered *unavailable or excluded* at trial and any evidence that became *available only after trial*"). "Under either definition" in cases involving guilty pleas, courts evaluate "whether the evidence is 'new' relative to the time [the petitioner] entered his guilty plea." *E.g., Dick v. Muse*, 2014 WL 4854689, at *2 (E.D. Va. Sept. 29, 2014) (citing *Taylor*, 188 F.3d at 244).

The court dismissed under Rule 12(b)(6). The questions of whether the district court identified the correct legal standard for "new" evidence under *Schlup*, and whether Wolfe's showing satisfied the "new, reliable evidence" standard, are subject to *de novo* review. *See Wolfe I*, 565 F.3d at 160. Thus, the Court should accept all well-pleaded allegations of the petition as true and draw all reasonable factual inferences in favor of the

petitioner. *Id.* at 169. The Court may consider the face of the petition and any attached exhibits. *Id.*

A.  **"New" Evidence Is Defined Broadly and Doubts Are Resolved in the Petitioner's Favor**

While courts note that successful actual innocence showings are rare, that is because the petitioner must ultimately convince the court that the old and new evidence combine to make it "more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *House*, 547 U.S. at 536–37. As this Court has explained, it is *this* formulation that ensures that petitioner's case is "truly 'extraordinary,'" while still providing petitioner "a meaningful avenue by which to avoid a manifest injustice." *Wolfe I*, 565 F.3d at 164.

But it does not follow that there is a high bar to demonstrate that relevant evidence is new. To the contrary, as this Court has also explained, the "*Schlup* Court adopted a *broad* definition of 'new' evidence." *Taylor*, 188 F.3d 239 at 243–44 (citing *Schlup* at 324). In addition to a broad definition, the Supreme Court widened the availability of "new" evidence by holding that it does not matter whether new evidence is admissible. *Schlup*, 513 U.S. at 327–28.

When questions of whether evidence is new are raised, courts give the benefit of the doubt to the petitioner. In *Schlup* itself, for example, the Supreme Court considered alibi information disclosed to the petitioner after trial to be new evidence even though the alibi witness was available at trial and claimed he would have testified if asked. *See* 513 U.S. at 312–13, 331.

In *House,* another landmark case, the petitioner presented evidence that bloodstains on House's clothing resulted from a mishandling of the evidence while in police custody. 547 U.S. at 547-50. The bloodstain evidence was used to convict House in the state court trial, so was available for testing at that time. *Id.* at 528-29. Nonetheless, the Supreme Court deemed it new evidence because it was not presented to the trial court. *Id.* at 555; *see also Cleveland,* 693 F.3d at 636–37 & n. 4 (alibi affidavit submitted after trial deemed "new" where it was unclear why counsel did not obtain witness's statement earlier).

## B.     The Government May Not Gain a Tactical Advantage in this Inquiry from Misconduct

When the petitioner alleges that government misconduct or other constitutional violations contribute to the unavailability of evidence at trial, or to the fact that it was not presented at trial, the standard is

relaxed further. The Eighth Circuit, for example, has explained that, under its test for "new" evidence, evidence is "new" if "not available at the time of trial through the exercise of due diligence," but "due diligence does not require a defendant to root out information that the State has kept hidden." *Jimerson v. Payne*, 957 F.3d 916, 927 (8th Cir. 2020).

In *Gomez v. Jaimet*, 350 F.3d 673 (7th Cir. 2003), the petitioner claimed his counsel was ineffective for failing to present certain evidence at trial and identified that non-presented evidence as "new" evidence under *Schlup*. *Id.* at 679. The government responded that the "evidence cannot be considered new because it is not newly discovered, i.e., Gomez was aware of its existence at the time of trial." *Id.* The Seventh Circuit disagreed, explaining that "nothing in *Schlup* indicates that there is such a strict limitation on the sort of evidence that may be considered in the probability determination." *Id.* Instead, "[a]ll *Schlup* requires is that the new evidence is reliable and that it was not presented at trial." *Id.* (citing *Schlup*, 513 U.S. at 324). *See also Smith v. Baldwin*, 466 F.3d 805, 806– 07 (9th Cir. 2006) (where "prosecutorial misconduct in connection with his federal habeas proceedings seriously interfered with Smith's ability to make the necessary showing under *Schlup*," court remedied harm by

presuming the exculpatory testimony improperly withheld from the court was true), *rev'd on other grounds*, 510 F.3d 1127 (9th Cir 2007).

## C. The District Court Defined "New" Evidence Narrowly, Resolved Doubts against Wolfe, and Allowed the Government to Gain from Misconduct

With these principles in mind, it is clear that *Schlup* "mandates a less-stringent showing for an award of gateway relief than" the "extraordinarily high" standard that the district court below applied. *See Wolfe I*, 565 F.3d at 164–65. In the challenged orders, the district court did not faithfully apply either the "newly available" or "newly presented" standards. It held instead that the 2023 Barber Declaration was not new because this Court found in 2013 that Barber's availability for Wolfe's then-pending retrial was "speculative," and Barber's new Declaration did not "foreclose" that speculation. JA2162; *see also* JA2169.

But this Court's 2013 opinion in *Wolfe VI* evaluated the district court's order following the Commonwealth's threats against Barber under a different standard. This Court explained that to justify the most extraordinary remedy available under the habeas statutes (a bar on further prosecution), Wolfe had to demonstrate that "a recognized constitutional error" – here, the suppression of exculpatory testimony –

"cannot be remedied by a new trial." *Wolfe VI,* 718 F.3d at 290 (citing cases). This is the highest standard in habeas law, requiring the most "extraordinary of circumstances." *Id.* at 288 ("preventing the retrial of a state criminal case is the strongest of medicine.").

This Court's finding that it was "speculative" as to whether Barber would invoke his right to avoid self-incrimination at Wolfe's retrial mattered to that consideration. Were it *conceivable* Barber might testify favorably to Wolfe, then the misconduct could, at least theoretically, "be remedied by a new trial." *Id.* at 289.

The district court appeared to believe that to show Barber's suppressed testimony is "new," Wolfe had to again rule out any possibility Barber would have testified at Wolfe's retrial. *See* JA2162 (quoting this Court's finding that "the availability of Barber's testimony at a retrial … is speculative," and finding Barber's new declaration "does not foreclose this speculation," so cannot be new); JA2162. The district court was wrong. No court requires a petitioner to prove that in a hypothetical world in which the petitioner went to trial, the testimony could not have, theoretically, been adduced. Indeed, even when there is an actual trial to look back on, the possibility that the evidence could have been presented

at trial is not dispositive of whether it is "new." *See Schlup*, 513 U.S. at 312–13, 331 (though alibi witness could have been called at trial, statement submitted with habeas petition was new evidence); *House*, 547 U.S. at 555 (though bloodstains could have been tested during trial, post-trial tests qualified as new evidence).

The *Schlup* inquiry does not consider but-for worlds in its calculus. The habeas court is asked to compare two *real* worlds: one at the time *of the plea*, and the other when the actual innocence claim is adjudicated. If "reasonable, properly instructed jurors would" be more likely to find reasonable doubt in the latter world, that can *only* be because the petitioner has presented "new" evidence. *Schlup,* 513 U.S. at 329.

The district court went astray by invoking *Wolfe VI's* "speculation" holding, which it thought itself bound by. JA2162. But the question below was not whether Barber's testimony was *conceivably* available at a hypothetical retrial, but whether his exculpatory testimony was *reasonably* available when Wolfe pled, or not presented below.

*Wolfe VI*, in addition, was adjudicated on a different factual record. Most notably, Barber has now *resolved any speculation* (certainly for purposes of Rule 12(b)(6)) as to whether and how he would have testified

at a retrial of Wolfe. Barber was willing to testify in Wolfe's favor at retrial *before* the September 11, 2012 meeting with the prosecutors. JA060-061, JA079-080; JA576 ("But for the threats made against me by the Commonwealth's officials, I would have testified truthfully – in Justin's favor – at his retrial, as I had in federal court."). That changed following the government's "interview." JA275. Thereafter, Barber resolved to exercise his Fifth Amendment rights if called to testify, a pledge he followed through on twice. JA062. His testimony in this regard is eminently sensible, since testifying for Wolfe carried, he believed, a grave risk to his life. JA066; JA575 ("I believe that if I had testified in Justin's favor at a retrial, there is a good chance I would not be alive today. At a minimum I'm sure my quality of life in prison would have been made worse.").

Barber further stated that were he called at Wolfe's retrial, he "would have resisted testifying to the fullest extent permissible." JA576. He also candidly admitted that "[i]f forced to testify" at Wolfe's retrial, "to protect myself from the prospect of the death penalty and the loss of my privileges in the prison, I would have had no choice but to testify against Justin again, as I had at his first trial." JA576

Because the factual record before this Court in 2013 and the district court adjudicating Wolfe's motion below is materially different, the district court was not bound by this Court's "speculation" finding. *See Brewster v. Commissioner of Internal Revenue*, 607 F.2d 1369, 1373 (D.C. Cir. 1979) ("Stare decisis compels adherence to a prior factually indistinguishable decision of a controlling court.").

But it also bears emphasis that if there was, in 2013, "speculation" as to whether Barber would provide exculpatory testimony at Wolfe's then-pending retrial, that speculation was caused by prosecutorial misconduct. *Wolfe VI*, 718 F.3d at 295 (Commonwealth's browbeating of Barber was the "pinnacle" of its misconduct) (Thacker, J. concurring in part). Criminal jurisprudence has built-in safeguards, exemplified, for example, by the exclusionary rule and by *Brady*, to prevent the government from obtaining a tactical advantage through its own misconduct. Thus, even if there were residual "speculation" regarding Barber, the court should not have held it against Wolfe.

The district court's failure to apply the correct legal standard is reason enough to remand. But it is also clear that Wolfe readily satisfies the correct standards for introducing "new" evidence, as shown next.

## II. WOLFE SATISFIES THE APPLICABLE TESTS FOR PRESENTING NEW, RELIABLE EVIDENCE

As noted above, courts apply two different tests to determine whether evidence is new, the "newly available" or "newly presented" tests. Wolfe satisfies both of them.

### A. Barber's New Exculpatory Testimony Was Not Reasonably Available at the Time of Wolfe's Plea

Courts that apply the "newly available" standard do not require petitioners to show the evidence was not *conceivably* available at the time of a trial or plea, but that it was not *reasonably* available. *See, e.g., Lopez v. Miller*, 915 F. Supp. 2d 373, 400 n.16 (E.D.N.Y. 2013) (finding "the evidence Lopez has submitted … was not reasonably available to him at trial," so was new); *cf. Bousley v. United States*, 523 U.S. 614, 622 (1998) (habeas relief available when basis for claim was not "reasonably available" at the time of the plea). In applying this standard, courts routinely resolve doubts about availability in favor of the petitioner. *See, e.g., House,* 547 U.S. at 552-53 (although new evidence was "by no means conclusive," it nonetheless "satisfied the gateway standard set forth in *Schlup*"); *Atkins v. Chappius*, 2020 WL 6264452, at *12–13 (W.D.N.Y. Oct. 23, 2020) ("under the 'newly discovered' reading, [the evidence]

*arguably* was not reasonably available to Atkins at trial," so the court would deem it "new" and proceed to review its reliability).

In considering whether Barber's testimony was reasonably available when Wolfe pled, it bears reminding that the district court was *certain* it was *unavailable* when ruling that further prosecution of Wolfe should be barred. *See Wolfe V*, 2012 WL 13103658, at *13 (the prosecutors "denied Petitioner a credible direct and rebuttal witness to defend himself from the charges he faces," and "*incurably* frustrated" any possibility of a fair trial ). While this Court disagreed in the limited sense that it could envision scenarios in which Barber's testimony *could* become available, that hardly means Barber's exculpatory testimony was *reasonably* available at the time of the plea.

### 1. Barber's Voluntary Testimony Was Not Reasonably Available

Before Wolfe pled, Barber had been called in two post-habeas proceedings and refused to testify both times. JA073-074. He did so on the advice of his counsel, who indicated the same advice would continue through trial. JA062; JA2146-2147.

There are no grounds to assert that Barber's *voluntary* testimony was reasonably available when Wolfe pled. JA2147-2148 (Leibing

asserting that Barber's "decision to not testify at trial absent immunity was final and obvious."); *see also* JA2146-2147 (detailing reasons); JA2143 (Donovan explaining that "It was … clear to me that Mr. Barber would not be available to Mr. Wolfe as a testifying witness at his retrial"); JA2143 (detailing reasons).[4]

### 2. Barber's Exculpatory Testimony Was Not Reasonably Available

The relevant question is not whether *any* Barber testimony was available to Wolfe when he pled, but whether the *exculpatory* testimony offered now was reasonably available. All record evidence shows it was not. The Commonwealth was open about what it meant, in its view, for Barber to testify "truthfully" at Wolfe's retrial, which doubled as what it expected Barber to say if it made a deal for his testimony:

> I'll state for the record, I can prove without any doubt whatsoever that Mr. Barber lied in Federal Court [when exonerating Wolfe] after being coached for years by representatives of the Innocence Project. Told not to worry about perjury. Told he could save a life. That when he went to Federal Court he lied.

---

[4] *See also* JA2143 (Mr. Leibing stating, "[f]rom my perspective, no one ever questioned this fact [that Barber's voluntary testimony was unavailable] or believed Mr. Barber might change his mind and testify.").

*See* JA; JA2144 . The new prosecutor's position mirrored what the prior prosecutors told Barber during the September 2012 meeting – testifying "truthfully" meant inculpating Wolfe, and contrary testimony could lead to the death penalty. *See* JA060; JA430-511. Barber got the message loud and clear. *See* JA574 ("They also told me that the next time I testified, they expected me to tell 'the truth,' which they made clear was that, in their view, Justin had hired me to kill Danny.").

Barber's attorney, Mr. Leibig, explains that "[n]o one involved with the case would have taken [] seriously" the proposition that the Commonwealth would "have offered Mr. Barber immunity for the purpose of allowing him to give the same allegedly-perjured testimony again at Mr. Wolfe's retrial." JA2147. In fact, throughout this period, the Commonwealth focused on *prosecuting* Barber for his testimony at the prior habeas proceeding, not securing his cooperation. *See* JA2144:

> [T]he prosecution had a firm and fixed opinion that Mr. Barber had lied in his federal court testimony; *and* that, because of that opinion, they desired to prosecute Mr. Barber further. I am aware of that because another defense team member reported that Deputy Commonwealth's Attorney Casey Lingan – who was serving as co-counsel to [prosecutor] Ray Morrogh – told him that they wished to prosecute Mr. Barber for perjury; and tried to solicit our help in providing information that could be used for that purpose.

*See also* JA2142 (Leibig describing three ways the Commonwealth's actions threatened criminal liability to Barber).

For his part, Barber's 2023 Declaration concedes that if he were compelled to testify, he would have *abandoned* the truthful testimony offered at federal habeas and reverted to the unconstitutionally tainted testimony from Wolfe's original trial. As he explained:

> If forced to testify despite the Commonwealth's threats against me, to protect myself from the prospect of the death penalty and the loss of my privileges in the prison, I would have had no choice but to testify *against* Justin again, as I had at his first trial.

*See* JA576. Wolfe's team was well aware of the threats to Barber, and their likely impact on him. JA2143, JA2145.

### 3. Barber's Compelled Testimony Was Not Reasonably Available

Barber's testimony could not realistically have been compelled if and when Barber invoked his Fifth Amendment rights. As an initial matter, under Virginia law, Barber could not have been compelled to testify based only on an offer of immunity. *See Gosling,* 14 Va. App. at 165 ("When a witness 'declares his belief that the answer to the question would [in]criminate, or tend to [in]criminate him, the court cannot compel him to answer, unless it is *perfectly clear*, from a careful

consideration of all the circumstances in the case, that the witness is mistaken, and that the answer *cannot* possibly have such tendency.'") (quoting *Temple v. Commonwealth,* 75 Va. 892, 898 (1881)) (emphasis in original); *see also Byrd v. Commonwealth,* 2003 WL 23021981 (Va. Ct. App. Dec. 30, 2003) ("Even had the trial court granted Spain use immunity, however, it could not compel him to testify if he decided to assert his Fifth Amendment privilege.") (citing *Gosling,* 14 Va. App. at 164-65); Va. Code Ann. § 19.2–270.

It also bears emphasis that no immunity offer was actually made. The Commonwealth knew Barber had counsel and had invoked his Fifth Amendment rights when called to testify after the September 2012 interview. This is critical because of the ***limits*** use or derivative use immunity affords witnesses, and because the prosecutors statements, with their strong implication that Barber would be immune only so long as his testimony inculpated Wolfe, meant any agreement would have to have been carefully negotiated with Barber's counsel to guarantee that Barber would not have been prosecuted for his testimony, regardless of what he said on the stand. There was no approach to Barber's counsel.

Derivative-use immunity does ***not*** protect a testifying witness from prosecution, *i.e.*, it's not transactional immunity; it is a very specific prohibition against the use of your statements or any new information derived from your statements as evidence against you. As the prosecutors who "interviewed" Barber in September 2012 reminded him, Barber was already bound to cooperate with the Commonwealth in its prosecution of Wolfe. JA060-061; *Wolfe IV,* 691 F.3d at 413, 418 n.7 (discussing Barber's cooperation agreement).

After the September 2012 interview, Barber's fear was not that his *new* testimony (or evidence derived therefrom) would be used against him, but that if he was disbelieved he would be found in violation of his ***original*** plea agreement and exposed to a trial on the original murder charge and the death penalty. That fear was reasonable as it is what the prosecutors threatened him with at the interview. While a derivative-use immunity agreement would have barred the Commonwealth from using Barber's testimony at Wolfe's retrial against Barber, it would not have prevented it from moving to find him in breach of his plea agreement and using ***other*** statements against him, including testimony from Wolfe's prior proceedings.

Moreover, Virginia's statute governing use immunity, Va. Code § 19.2-270, does not contemplate *derivative-use* immunity. Any agreement to extend such immunity would have been purely a "private" agreement between the State and Barber. *See Lampkins v. Commonwealth*, 44 Va. App. 709, 722, (2005). A summary, verbal offer the prosecutor once fleetingly described on the record but never extended to Barber was not an agreement, and was too non-specific to be an offer.

Given the contingency the prosecutor spelled out on the record, that testifying "truthfully" equated to inculpating Wolfe, it defies credulity to presume Barber's counsel would have advised Barber to enter into a contractual immunity agreement that did not include a negotiated provision that the Commonwealth was barred from arguing that Barber violated his ***plea agreement*** based on his testimony at Wolfe's retrial. Given the positions the prosecutor expressed about Wolfe's guilt and the veracity of Barber's prior testimony, it is just as doubtful that the Commonwealth would ever have agreed to such a carve-out.

As Mr. Leibig explained:

> The immunity necessary to protect Mr. Barbour and extinguish his Fifth Amendment privilege would have had to foreclose any risk that his plea agreement would be revoked, any charge of perjury in federal court, any

> charge of perjury in state court, and any uniform good
> behavior violation related to his statements at the
> habeas proceeding.

JA2147. The professionals with the most knowledge and most interest in an agreement believed there was "no fathomable possibility" it could be secured. JA2144; *see also* JA2147 ("Given the parties' entrenched positions in the case, it was extremely obvious to me as Mr. Barber's attorney that no immunity would ***ever*** be offered.").

\* \* \*

As robustly shown, Wolfe was not required to "foreclose" all theoretical possibilities regarding Barber's availability. While that demand may have made sense in 2013 when this Court was considering whether Wolfe should be unconditionally released and his retrial barred, it is not the standard here. Nonetheless, Wolfe's showing has now eliminated all doubt about Barber's availability. Because Barber's 2023 Declaration was not reasonably available at the time of Wolfe's plea, it qualifies as "new" evidence under *Schlup*.

## B. Barber's 2023 Declaration Is "Newly Presented"

Wolfe also satisfies the less rigorous "newly presented" standard.

### 1. Barber's New Testimony Was Not Presented to the Trial Court

Under this standard, *it does not matter* whether the evidence *could have* been presented to the trial court or was discovered before the plea or trial. *See Schlup*, 513 U.S. at 324 (statement of alibi witness who was available but not presented at trial qualified as "new" evidence); *Gomez*, 350 F.3d at 679–80 (similar). The test for "newly presented" evidence is straightforward. In a case involving a guilty plea, it is "evidence that was not before the trial court" at the time of the plea. *See Griffin v. Johnson*, 350 F.3d 956, 963 (9th Cir. 2003) (records "allegedly in Griffin's possession before trial," but not offered to the court "prior to accepting the plea bargain," were "newly presented evidence"); *Dick*, 2014 WL 4854689, at *2 (in guilty plea case, considering whether "new" evidence was "presented" to trial court before plea); *Williams v. Muse*, 2014 WL 2921932, at *6 (E.D. Va. June 27, 2014) (same). As with the "reasonably available" standard, courts resolve doubts in favor of the petitioner. *See Reyes v. Virginia*, 2022 WL 2161031, at *13 n.14 (E.D. Va. June 14, 2022) ("In an abundance of caution, the Court will deem the statement 'newly presented' and will consider it."); *Mubang v. United States*, 2011 WL 3511078, at *8 n.8 (D. Md. Aug. 9, 2011) ("The court assumes that all of

Mubang's submissions amount to new evidence, although it is not clear that is in fact the case.").

Under this standard, there is no need to speculate about what *could* have been presented to the trial court if the petitioner did not plead guilty; the question is whether the evidence *was* presented before the plea. Stated differently, if the habeas court considering "new" evidence "is the first to review the statement's contents," it should "deem the statement 'newly presented' and [] consider it." *Reyes*, 2022 WL 2161031, at *13 n.14; *see also Gladney v. Pollard*, 799 F.3d 889, 895–96 (7th Cir. 2015) (new evidence threshold satisfied if petitioner "presents evidence not previously considered").

Barber's 2023 Declaration was not "presented" to the Prince William County Circuit Court during Wolfe's first trial (when Barber testified against Wolfe), or during retrial proceedings. Indeed, the only time Barber was called during retrial proceedings, he refused to testify. JA073-074. Consequently, Barber's 2023 Declaration is "new" evidence under this standard.

## 2. Testimony that Overlaps with Prior Testimony May Still Be Deemed "New"

As just shown, Barber's 2023 Declaration is "new, reliable evidence" under either of the standards courts apply, because it was not reasonably available to Wolfe at the time of his plea or presented to the trial court during retrial proceedings. No further analysis is required, and there is no basis to impose additional burdens. As one court has explained:

> The burden for proving actual innocence in gateway cases is sufficiently stringent and it would be inappropriate and unnecessary to develop an additional threshold requirement that was not sanctioned by the Supreme Court. … [I]f a petitioner comes forth with evidence that was genuinely not presented to the trier of fact then no bar exists to the habeas court evaluating whether the evidence is strong enough to establish the petitioner's actual innocence.

*Gomez*, 350 F.3d at 680. That said, the district court suggested that Barber's declaration is not "new" because it is "consistent with the version of events he offered in his previous testimony in Wolfe's federal habeas proceedings." JA2161; *see also* JA2169. The district court erred.

Testimony submitted for purposes of *Schlup* can be "new" despite overlapping with prior testimony, including a recantation. The Sixth Circuit has addressed precisely this situation. In *Cleveland v. Bradshaw*, 693 F.3d 626, 636 (6th Cir. 2012), the petitioner provided the district

court with a core witness's 2006 declaration recanting earlier statements inculpating the petitioner. The district court held that the "2006 recanting affidavit was not new evidence because" it was the declarant's second recantation and the petitioner had ample opportunity to address these issues "during his trial." *Id.* It "reasoned that the fact of Avery's recantation was available to Cleveland at the time of his trial." *Id.*

The Sixth Circuit reversed. The district court had ignored new testimony including the declarant's explanation for his changing testimony over time. The testimony was impacted by his "fear that the prosecutor would charge him with Blakely's murder" if he did not change his testimony. *Id.* The 2006 declaration was offered in a different context than the one in 1991, which in light of the facts of the case made it more credible. *See id.* Because of these modest differences, the later "recanting affidavit thus contains information that was not available to [petitioner] as the time of his trial," and qualified as "new." *Id.*

The same is true here. Barber's testimony dramatically shifted from Wolfe's first trial, in 2001, to 2005 when he recanted his trial testimony, only for him to later recant his recantation. JA076. Barber shifted once more at Wolfe's hearing on the merits of his habeas claims, testifying in

his favor. JA075-076. His willingness to testify shifted again in light of the Commonwealth's threats. While this mix of sworn, unsworn, contradictory statements may have been "available" in some sense to Wolfe when he pled, there is no substitute for a live trial witness, which was not reasonably available to Wolfe when he pled.

Even in written form, a declaration that affirms one version of prior testimony offered and persuasively explains the reasons why testimony changed over time is "new" evidence under the modest standard for establishing so. And a declaration made notwithstanding threats of prosecution for similar testimony is different than one made while not under threat, and adds to the constellation of evidence available to Wolfe at the time of his plea. JA2146 (describing array of threats Barber faced).

As in *Cleveland,* Barber provides new testimony about the reasons his testimony (and willingness to testify) varied over time, including during Wolfe's retrial proceedings. JA570-572; JA575-576. His new testimony is also offered in a material new context. Because Barber was threatened with a new prosecution because of his prior truthful testimony during Wolfe's prior habeas proceedings, that he came forward anyway with exonerating testimony makes it far more credible than

before. JA076-077. The 2023 Declaration is also more credible than his prior recantation, because Barber had withdrawn that recantation by the time the district court found Wolfe satisfied *Schlup* in 2011, in *Wolfe II*, and has not done so this time. *See* JA076.

### 3. Newly-Presented Evidence of Misconduct Supports a Finding of Actual Innocence

Barber's testimony is also "new" because it contains new details about the Commonwealth's misconduct, including its materiality, which courts may construe in support of an actual innocence finding. There is, of course, no question that the Commonwealth's browbeating of Barber immediately after its stinging loss before this Court constitutes misconduct. *See, e.g., Smith,* 466 F.3d at 823 ("Threatening a potential witness for the defense with execution constitutes prosecutorial misconduct far more coercive than that present in any reported case of which we are aware."); *Wolfe VI*, 718 F3d at 295 (Thacker, J. concurring in part) (describing Barber "interview" as the "pinnacle" of the Commonwealth's misconduct); *Teleguz*, 806 F.3d at 812 ("In *Wolfe [VI]*, the prosecution illicitly threatened a recanting witness whose recantation had already been deemed candid and persuasive at an evidentiary hearing to impact how he would testify at Wolfe's retrial.").

Courts have recognized that "evidence of police and prosecutorial misconduct is a basis upon which a petitioner can satisfy the actual innocence standard." *See Hash v. Johnson*, 845 F. Supp. 2d 711, 728-29 (W.D. Va. 2012); *see also Lisker v. Knowles*, 463 F. Supp. 2d 1008 (C.D. Cal. 2006) (similar*), abrogated on other grounds*, *Lee v. Lampert*, 610 F.3d 1125 (9th Cir. 2010). As in *Hash*, "widespread police and prosecutorial misconduct" is endemic to this case, and Barber's 2023 declaration sheds important, additional light on it, by unambiguously establishing the misconduct's materiality. *See also Floyd v. Vannoy*, 894 F.3d 143, 156 (5th Cir. 2018) (en banc) (evidence of lead detective's "misconduct" was key pillar of "newly discovered" evidence credited in finding petitioner met actual innocence standard); *United States v. Williams*, 790 F.3d 1059, 1082 (10th Cir. 2015) (evidence petitioner's confession was coerced credited in actual innocence inquiry).

During the "interview" of Barber, the Commonwealth's officials used subtle pressure and would sometimes speak in code, making it unclear precisely what Barber may have taken out of it, and how it impacted him. After all, for example, the prosecutors told a story about an arcane U.S. Supreme Court case; pulled out Barber's dense plea

agreement and read from it; and either benignly, or ominously, asked Barber if he had a "job" and whether he liked it. JA060-061. Until Barber provided his 2023 Declaration, there was no way to know how Barber took these threats, or if they had a material impact on him. Barber's 2023 Declaration provides this information, cementing Wolfe's showing of unlawful witness intimidation and the suppression of exculpatory evidence, and its materiality, supporting Wolfe's due process claims and his actual innocence showing. JA078-082.

*     *     *

Ultimately, the question for the Court is simple: is the pre-existing evidence pointing to innocence *enhanced* by the inclusion of Barber's 2023 Declaration? *See Schlup,* 513 U.S. at 331–32 (the Court "must assess the probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial."). Once the threshold showing of "new evidence" is made, the Court makes a "probabilistic determination about what reasonable, properly instructed jurors would do." *Id.* at 329. To be "new," then, the 2023 Barber Declaration need only increase that probability in a reasonable juror's eyes. *See House,* 547 U.S. at 538 (court

should "assess how reasonable jurors would react to the overall, newly supplemented record").

*Of course* the 2023 Barber Declaration increases that probability. It is offered in a context that makes it more credible, provides new details not presented or reasonably available at the time of Wolfe's plea, and sheds new light on the police and prosecutorial misconduct in this case. It is "new" evidence for purposes of *Schlup*.

## C.   Barber's New Testimony Is Reliable

Finally, the district court suggested, seemingly in *dicta*, that Barber's 2023 Declaration was not the type of "new, reliable evidence" envisioned by *Schlup*. JA2169. To the contrary, *Schlup* includes "trustworthy eyewitness accounts" among the types of evidence that qualifies for consideration in the actual innocence inquiry. 513 U.S. at 324. The district court already found Barber's prior testimony credible when adjudicating Wolfe's earlier actual innocence showing in *Wolfe II* and when awarding Wolfe habeas relief in *Wolfe III*. Moreover, the district court previously recognized that Barber's exculpatory testimony is well corroborated. *Wolfe II*, 940 F. Supp. 2d at 286–87 (there is "considerable corroboration" of Barber's statement taking sole

responsibility for the murder"). This Court reviewed Barber's habeas testimony in its order affirming both of those decisions, and approvingly cited the district court's finding that "Barber's recantation [was] 'credible'" and his "'demeanor and candor' [were] 'persuasive.'" *Wolfe IV*, 691 F.3d at 418.

When Judge Jackson, a former prosecutor, made the underlying findings, he did so following an opportunity to observe Barber in person under direct and cross-examination, and to question him directly. By that time, moreover, Barber had recanted his initial exculpatory statement. The court still found him credible and persuasive. *Wolfe III*, 819 F. Supp. 2d at 548, 570. In the instant proceedings, the district court did not afford Wolfe an evidentiary hearing, as this Court requires in these circumstances. *Wolfe I*, 565 F.3d at 170 (when a witness providing the "only direct evidence implicating [a petitioner] in the murder-for-hire scheme" recants his testimony, this recantation "strongly suggests that an evidentiary hearing may be warranted"); *Teleguz*, 689 F.3d at 325 (abuse of discretion for district court to fail to "conduct a sound and thorough analysis of" petitioner's "gateway innocence claim as required by" *Wolfe I*); see also *Townsend v. Sain*, 372 U.S. 293, 313 (1963); *Dick*,

2014 WL 4854689, at *3. Thus, to the extent the district court's statement is not *dicta* it provides another avenue for reversal.

## CONCLUSION

This Court should overrule the challenged orders and find Wolfe has satisfied *Schlup's* threshold "new, reliable evidence" requirement.

## STATEMENT REGARDING ORAL ARGUMENT

Wolfe requests oral argument. This appeal centers on a legal standard that has split the circuits, and that the court below misunderstood. If properly construed Wolfe's showing establishes actual innocence, which would allow his powerful constitutional claims to be adjudicated on the merits, and his convictions vacated.

Dated: October 7, 2024
Respectfully submitted,

/s/ Scott M. Abeles
Scott M. Abeles
CARLTON FIELDS, P.A.
Suite 400 West
1025 Thomas Jefferson Street, NW
Washington, DC 20007
Telephone: (202) 965-8119
Facsimile: (202) 965-8100
sabeles@carltonfields.com

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments), this brief contains 11,438 words.

This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and (6) because this brief has been prepared in a proportionally spaced serif typeface using Microsoft Word 365 in Century Schoolbook 14-point font.

/s/   Scott M. Abeles